# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

KENYA D. WOOTEN, o/b/o B.F.,    )
    )
      **Plaintiff,**    )
    )
**vs**    )    **Case number 4:08cv0236 DJS**
    )              **TCM**
**MICHAEL J. ASTRUE,**    )
**Commissioner of Social Security,**    )
    )
      **Defendant.**    )

# REPORT AND RECOMMENDATION
# OF UNITED STATES MAGISTRATE JUDGE

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("the Commissioner"), denying the application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383b, filed on behalf of B. F. ("Plaintiff") by his mother, Kenya D. Wooten, is before the undersigned for a review and recommended disposition. Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Ms. Wooten applied for SSI on Plaintiff's behalf in September 2005,[1] alleging he was disabled due to attention deficit hyperactivity disorder ("ADHD") and oppositional defiant

---

[1]Ms. Wooten had earlier applied for SSI in Plaintiff's behalf when he was less than six months old. (Doc. 14-3 at 125.) This application was denied at the initial level and was not pursued. (Id. at 126.)

disorder. (Doc. 14-3[2] at 8-10.) This application was denied initially and following an administrative hearing in May 2007 before Administrative Law Judge ("ALJ") Joseph J. Simeone. (Doc. 14-2 at 13-23, 26-73.) The Appeals Council denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 6-8.)

## Testimony Before the ALJ

Ms. Wooten, Plaintiff, and James Reid, Ph.D., testified at the administrative hearing.

Ms. Wooten, represented by counsel, testified that her son, Plaintiff, was then nine years old.[3] (Id. at 28.) Plaintiff lives with her, her four other children, her sister, and her sister's two children. (Id. at 29-30.) She is a single parent. (Id. at 30.) She received her General Equivalency Degree ("GED") on-line. (Id. at 31.) She is unemployed, having had to stop work a few weeks earlier due to arthritis in her hands. (Id. at 30.) She is receiving temporary assistance and food stamps. (Id. at 30-31.) All her children are on Medicaid. (Id. at 31.)

Ms. Wooten explained that Plaintiff was disabled because he cannot read, although his teacher did say he reads at an early kindergarten level. (Id.) Ms. Wooten and Plaintiff go to the library two or three times a week. (Id. at 32.) She tries to find books for him with only three or four-letter words. (Id.)

---

[2]The Commissioner filed the administrative record in electronic form. For ease of reference, the Court will refer to the docket number when citing the relevant portions of that record.

[3]Plaintiff was born on February 28, 1998.

For a short time, after Plaintiff was suspended, he was home-schooled. (Id. at 33.) He currently attends Dunbar Elementary School. (Id.)

Other problems that Plaintiff has are outbursts and getting into trouble at school. (Id. at 34.) For instance, at another school he starting having a tantrum when the class was getting ready to read. (Id.) These outbursts usually happen at school; however, he had one at home a few days earlier and started hollering "no." (Id. at 34, 35.) Within the past two weeks he hit someone at school. (Id. at 35.) The principal called her and she calmed Plaintiff down by talking to him over the phone. (Id.)

He is taking Concerta for his outbursts and is being treated by a psychiatrist, Dr. Alicia Gonzalez. (Id. at 36.) There is nothing wrong with him physically. (Id.)

Ms. Wooten further testified that Plaintiff has some school friends. (Id. at 37.) They do not come to his house all the time because there is nowhere for them to play and there is a lot of drug activity in their apartment building. (Id.) She drives him to his friends' house to play. (Id. at 38.) He sometimes has problems with his older friends who might try to tell him not to do something he should not. (Id.) He and his friends go to the park, play video games, and take care of dogs. (Id.)

Plaintiff will ask for help with his homework and gets frustrated when he does not understand something. (Id. at 39.) He knows his "ABCs," although he has difficulties with recognizing some letter sounds. (Id.) She plays spelling games with him. (Id.) The week before, she gave him a spelling test; he did not spell all the words correctly. (Id. at 40.) For instance, he could not spell "green," but could spell "cat." (Id.)

Dr. Reid was the next witness to testify. He has a Ph.D. in psychology. (Id. at 41.) He is a clinical psychologist, is under contract with the Office of Disability Adjudication and Review, and teaches at Washington University. (Id.) Dr. Reid had reviewed Plaintiff's file, including the material submitted that morning. (Id. at 42.) Asked to give a "thumbnail sketch" of Plaintiff, Dr. Reid replied:

> I do not agree that the diagnosis is [ADHD], the diagnosis is clearly oppositional defiant disorder. Dr. Russo [sic] got that correct in his report from Florissant Psychological Services, consultative examination. He also offers a diagnosis of [ADHD], but if I evaluate under [Listing] 112.11 for [ADHD], he needs all three, marked inattention, marked impulsivity and marked hyperactivity, he doesn't have that. He has inattention, impulsivity mostly related to aggression and the oppositional defiant disorder. There's really not evidence of marked hyperactivity.

(Id. at 43.) Plaintiff did not meet the criteria for Listing 112.11 and there was no Listing for oppositional defiant disorder. (Id. at 44.) Moreover, it was not clear whether the oppositional defiant disorder was severe and marked or met any other Listing. (Id.) Dr. Reid noted that there was no evidence in the file after the medical evidence of June 2006 that Plaintiff had been placed on medication and was improving. (Id.) He further noted that Plaintiff had never been assessed for a learning disability and the school records did not indicate that he was in, or assessed for, a special education program. (Id. at 44-45.) Dr. Gonzalez had reported that Plaintiff was doing better at school and was calmer on the medication. (Id. at 45.) Plaintiff's attorney interjected that his dosage of Concerta was increased on April 6, 2006, because his behavior was unpredictable, including not focusing, not competing work, and fighting. (Id. at 45-46.)

Asked if he agreed with Dr. Gonzalez's assessment of Plaintiff's Global Assessment of Functioning[4] ("GAF") score of 40[5] and Dr. Mahai's[6] of 38 to 40, Dr. Reid replied, "That's awfully low." (Id. at 46.) He also noted that the 40 had been assessed when Plaintiff first came to the clinic after threatening a teacher. (Id.) According to the record, Plaintiff's GAF had improved after he was placed on medication. (Id.) Indeed, three months later, Dr. Rosso had assessed the GAF as 50.[7] (Id. at 46-47.) Asked about a teacher's negative observations of Plaintiff's behavior, Dr. Reid noted that Plaintiff had not been placed in any special education classes. (Id. at 48.) He concluded that Plaintiff had mild difficulties in cognition and communication, moderate difficulties in age-appropriate social functioning, mild difficulties in personal functioning, and moderate difficulties in concentration, persistence and pace. (Id.)

---

[4]"According to the [American Psychiatric Ass'n Diagnostic Manual and Statistical Manual of Mental Disorders 32 (4th ed. 1994)], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003). See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).

[5]A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., . . . child frequently beats up younger children, is defiant at home, and is failing at school)." Diagnostic Manual at 32.

[6]Dr. Mahai is Plaintiff's pediatrician. His records are not included in the administrative record.

[7]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic Manual at 32.

Addressing the domains of mental functioning employed by the Social Security Administration, Dr. Reid described Plaintiff's ability to acquire and use information has mild or moderate, again noting that he had not been placed in any special education classes. (Id. at 49.) He was moderately limited in his ability to attend and complete tasks and to interact and relate with others. (Id. at 50.) He was not limited in his ability to move about and manipulate objects and care for himself. (Id.) Dr. Reid found an inconsistency between the teacher's report of seriously disruptive behavior and Ms. Wooten's failure to take Plaintiff back to the clinic. (Id. at 52.) He did not have any reason to believe that the teacher was lying. (Id.) Asked about the "x's" marked by the teacher to indicate whether Plaintiff had accomplished certain goals, e.g., complete assigned tasks, turn in homework, Dr. Reid replied that the "x's" could reflect a lack of trying, which would be consistent with oppositional defiant disorder. (Id. at 54.) He acknowledged that the lack of an Individual Education Program ("IEP") could be the result of Plaintiff having been in and out of various schools. (Id. at 55.) Plaintiff might also be "undereducated" as a result of his erratic schooling. (Id.)

Plaintiff testified that he was in second grade, again. (Id. at 58.) He did not know why he was repeating the grade. (Id.) He has difficulty reading; specifically, he does not know how to read hard words. (Id. at 59.) When he sees one, he asks his teacher for help. (Id.) He does not have trouble with any other subject, and likes math. (Id. at 61.)

He does not like his teacher because the teacher lets other students have free time, but not him. (Id. at 59.) He gets into fights with other children when they hit him and he hits

back.  (Id.)  Also, he gets upset at school when children call him names.  (Id. at 60.)  He plays with the other children at recess, but does not play with the children who make fun of him.  (Id. at 61.)  He likes to play kick ball and video games.  (Id. at 62.)

He takes a pill everyday; however, it does not make any difference in how he feels.  (Id. at 60-61.)

When asked by the ALJ, he could spell "cat" and "dog," could recite the alphabet, and could correctly add three plus two.  (Id. at 66.)

## Medical, School, and Other Records Before the ALJ

When applying for SSI for her son, Ms. Wooten listed August 1, 1998, see note 1, supra, as the date when he became disabled.  (Doc. 14-3 at 49.)  The disability was caused by attention deficit and behavior disorder.  (Id.)  He had first been seen at the Hopewell Clinic on November 14, 2005, for his behavior disorder.  (Id. at 50.)  He was seen again on November 28, and his next appointment was on December 28.  (Id.)  His doctor, Dr. Gonzalez, had prescribed 18 milligrams of Concerta to be taken each morning to moderate his hyperactivity.  (Id.)  The side effect was that Plaintiff was unable to sleep at night.  (Id.)  He had attended the Washington Montessori School in September until September 21, when he was suspended.  (Id. at 52.)  He was currently being home schooled.  (Id.)  He was not in special education.  (Id.)

Plaintiff's father also completed a Disability Report.  (Id. at 62-68.)  He reported that Plaintiff was still getting in trouble at school and having problems learning.  (Id. at 63.)  When he got upset or frustrated, he became disoriented and sleepy.  (Id.)  The problems

started in February 2006.  (Id.)  Plaintiff was being treated at the Hopewell Center by Dr.

Gonzalez.  (Id. at 64.)

On a separate Function Report form for children ages six to twelve, completed three

months after the SSI application was filed, Ms. Wooten reported that Plaintiff did not have

any problems seeing, hearing, talking, or doing physical activities.  (Id. at 24-25, 28.)  She

was not sure if he had problems communicating because he did not deliver telephone

messages, did not repeat stories he had heard, did not accurately tell stories or riddles, and

did not explain why he did something, although he did use sentences with "because, "what

if," or "should have been," and talked with family and friends.  (Id. at 26.)  She was not sure

if his impairment affected his behavior with other people because he did not have friends his

own age, did not make new friends, did not get along generally with teachers, and did not

play team sports, although he did get along generally with her and other adults.  (Id. at 29.)

She was also not sure if his impairment affected his ability to take of himself or cooperate

with others who did.  (Id. at 30.)  For instance, he could use a zipper and buttons, brushed

his teeth, picked up and put away his toys, helped around the house, did what he was told

most of the time, and obeyed safety rules, but did not tie his shoelaces, wash his hair by

himself, hang up his clothes, or eat by himself.  (Id.)  She was sure that his ability to progress

in learning was impaired.  (Id. at 27.)  For instance, although he could print some letters and

his name and could add and subtract numbers over ten, he could not read simple words and

sentences, read capital and small letters, or tell time.  (Id.)  She was also sure that his ability

to pay attention and stick to a task was limited.  (Id. at 31.)  He could work on art and craft

projects, but could not finish what he started, complete his homework or chores, or keep busy on his own. (Id.)

Plaintiff's school records before the ALJ are from the second grade.

When Plaintiff was seven years old and in the second grade at Washington Montessori, his teacher reported on September 1, 2005, that he was unable to perform in the class at the appropriate level. (Id. at 15.) He had trouble reading, staying focused, and following directions. (Id.) He had poked himself with a pencil, had tried to run away from school, and was twice caught trying to steal. (Id.) A meeting with his mother was held the next week. (Id. at 17-21.) In addition to the foregoing behaviors, Plaintiff's crying episodes, sadness, sleeping for long periods of time, not participating in class, and verbally threatening the teacher were discussed. (Id. at 17.) Ms. Wooten was to have Plaintiff see his pediatrician. (Id.) The same day, her report that Plaintiff had been diagnosed in 2003 for lead poisoning was noted. (Id. at 18.) Because he would sleep in class for several hours, it was suggested that he be evaluated for a possible sleep disorder. (Id. at 19.) As of the September 9 meeting, Plaintiff had been in school for ten days.[8] (Id. at 21.) His estimated grade level for math, reading, spelling, and written language was kindergarten. (Id.) His cognitive functioning and his adaptive behavior were both below average compared to his peers. (Id.) He had no motor problems. (Id.)

Plaintiff attended Dunbar Elementary School for the third quarter of the 2006-2007 school year. (Id. at 70-72.) He was again in the second grade. When assessing his abilities

_____

[8]The September 1 observations were on the third day of school.

in reading, language, spelling, handwriting, mathematics, science/health, social studies, art, music, and work habits, the teacher rated his abilities as either "1" or "X" for "not yet," "2" for developing, or "=" for inconsistently. (Id. at 71-72.) In physical education, he achieved a "3" for secure or an "⊤" for consistent. (Id. at 72.) The teacher, Tad Hartman, noted under the comment section that Plaintiff needed extra help with reading and needed to try to do his work. (Id. at 71.)

A letter in the file from the Executive Director of the Office of Special Education for the St. Louis Public Schools dated December 16, 2005, reads that the Office could not locate information that the listed student had received special education services. (Id. at 47.) The listed student is *not* Plaintiff; the date of birth listed is not his. (Id.)

Plaintiff's medical records before the ALJ also begin in September 2005.

On September 26, Ms. Wooten and Plaintiff were seen at Provident Counseling. (Id. at 22.)

The earliest medical record from the Hopewell Center is of Plaintiff's first visit on November 14, 2005. (Id. at 84-85; Doc. 14-4 at 2-15, 33, 43-47, 49-50, 52-56.) Ms. Wooten described the precipitating event as Plaintiff threatening to shoot the teacher in the face, "fighting, messing with other kids, and running out of the classroom." (Doc. 14-4 at 2, 43, 52.) Her response was to home-school him. (Id.) She had a ninth-grade education and was

working on her GED.[9]  (Id. at 3, 5, 44, 46, 53, 55.)  Plaintiff had been diagnosed after the

one, 2005 visit to Provident with ADHD, combined type.  (Id. at 2, 43, 52.)

On examination, Plaintiff was alert and oriented to time, place, and person.  (Id. at 3,

44, 53.)  His speech was clear and coherent; his mood was sad; his affect was appropriate;

his  motor activity was hyperactive; his judgment and insight were poor.  (Id.)  He had no

hallucinations or delusions.  (Id.)  He could not read, except for a few sight words.  (Id.)  He

could count backwards from ten.  (Id.)  With the exception of New York City, he could not

list any major United States city, but he could name six animals within one minute.  (Id.)  He

could not explain why he threatened the teacher.  (Id. at 5, 46, 55.)  He had no gun, nor did

he have access to one.  (Id.)

Ms. Wooten reported that Plaintiff destroyed property.  (Id. at 3, 44, 53.)  For

instance, he knocked the light out of a neighbor's car and knocked holes in the classroom

wall when in kindergarten.  (Id.)  Plaintiff had been suspended five or six times in

kindergarten, multiple times in first grade, and three to four times in second grade.  (Id.)  He

had tantrums and deliberately annoyed people.  (Id.)

Plaintiff reported that he felt unsafe in his neighborhood.  (Id. at 4, 45, 54.)  He had

to be reminded to take a bath.  (Id.)

His primary diagnosis was ADHD, combined type, and learning disability, reading

disorder.  (Id.)  He had "severe anger problems and difficulties in managing."  (Id. at 5, 46,

---

[9]The psychologist questioned whether Ms. Wooten "could provide adequate home schooling."  (Id.
at 5.)

55.)  His current GAF was 38 to 40.  (Id. at  4, 45, 54.)  It was recommended that he "have a psychiatric evaluation and possibly medication management."  (Id. at 6, 47, 56.)

As part of the evaluation, Ms. Wooten completed a Child Behavior Checklist for Ages 6 - 18.  (Id. at 9-12.)  The evaluation required her to assess whether Plaintiff had certain behaviors.  (Id. at 10, 12.)  She was to rate each behavior as "not true (as far as you know)," "somewhat or sometimes true," and "very true or often true."  (Id.)  The "very true or often true" behaviors included poor school work, being inattentive or easily distracted, inability to concentrate or pay attention for long, inability to sit still, being restless or hyperactive, and clinging to adults or being too dependent.  (Id.)  The other, 114 behaviors were "somewhat or sometimes true" in 31 instances.  (Id.)  Asked if Plaintiff received special educations services, Ms. Wooten replied that he did not.  (Id. at 11.)  He had four or more close friends, not including his siblings.  (Id.)  Asked if he had repeated any grades or had any academic or other problems in school, she replied, "No."  (Id.)  She was most concerned about Plaintiff being able to read at his age level.  (Id.)  She described him as a "fun, lovable, caring person."  (Id.)

As recommended, Plaintiff underwent a psychiatric evaluation at Hopewell on November 28 by Alicia Gonzalez, M.D.  (Id. at 15-16, 41-42.)  Dr. Gonzalez took the history and description of Plaintiff's behavior problems from Ms. Wooten.  (Id. at 15, 41.)  She noted that Plaintiff "ha[d] difficulty staying still and bec[ame] restless during the interview."  (Id. at 16, 42.)  Dr. Gonzalez diagnosed Plaintiff with ADHD and a reading disability, assessed his current and past GAF as 40, and prescribed 18 milligrams of Concerta once a day.  (Id.)

Plaintiff was scheduled for an appointment on December 22, but missed it. (<u>Id.</u> at 33.) A phone call was placed to his mother the next day. (<u>Id.</u>) She called back and reported that he had been at home since the last appointment but was going to return to school. (<u>Id.</u>) As of February 9, 2006, however, he was still not attending school. (<u>Id.</u> at 34, 38, 61.) The school had requested a statement about Plaintiff's diagnosis and treatment and a report of the days he was seen at Hopewell before accepting him back at school. (<u>Id.</u> at 38, 61.) The school had requested a similar statement for Plaintiff's brother. (<u>Id.</u>) Ms. Wooten thought the school did not want her two sons back. (<u>Id.</u>) In March, Dr. Gonzalez noted that Ms. Wooten and Plaintiff reported that he was doing better on his medication. (<u>Id.</u> at 34, 37, 60.) His school had not yet done an IEP, although his mother had requested one. (<u>Id.</u>) The dosage of Concerta remained at 18 milligrams. (<u>Id.</u> at 37, 39, 60.) The next month, Ms. Wooten reported that the school was not going to do an IEP for Plaintiff because they did not have enough information. (<u>Id.</u> at 36, 59.) The school had given Ms. Wooten some information about IEPs, but she did not remember what it was and forgot to bring it with her. (<u>Id.</u>) Plaintiff's dosage of Concerta was increased to 27 milligrams daily because his behavior was "a little bit unpredictable" and he was "not focusing, fighting, and not completing his work." (<u>Id.</u>) In June, Plaintiff was at home after being suspended for "behavioral problems with another little boy." (<u>Id.</u> at 35, 58.) He and his brother were to attend summer school, but Ms. Wooten did not know where. (<u>Id.</u>) The dosage of Concreta was decreased to 18 milligrams for the summer. (<u>Id.</u>) He was to be seen again in July. (<u>Id.</u>)

Plaintiff's dosage of Concerta was increased in July to 27 milligrams. (Id. at 51.) This dosage was renewed in August and September. (Id.)

Although there is no record of Plaintiff seeing Dr. Gonzalez in July, he and Ms. Wooten did see a counselor with Hopewell on July 6. (Id. at 57.) The counselor noted that Ms. Wooten was distraught because Plaintiff had allegedly engaged in sodomy with another boy. (Id.) His brother was being held in detention. (Id.) Ms. Wooten had been trying to home school Plaintiff, but the counselor opined that she was a "poor candidate" for home schooling due to her own intellectual deficits. (Id.) Dr. Gonzalez saw Plaintiff in August. (Id.) He was not yet in school; the school was planing on doing an IEP. (Id.)

The ALJ also had before him several evaluations of Plaintiff performed as a consequence of his SSI application.

The earliest of these was a Teacher Questionnaire completed in December 2005 by Plaintiff's second-grade teacher at Washington Montessori. (Doc. 14-3 at 38-45.) In this questionnaire, completed pursuant to Plaintiff's SSI application, his teacher reported that he had been enrolled in her class for eight days, five of which he had been absent. (Id. at 38.) He had been transferred from one classroom to another. (Id. at 39.) Of ten activities in the domain of acquiring and using information, he had a serious problem in only one: "[r]eading and comprehending written material." (Id.) He had an obvious problem in another: "[p]roviding organized oral explanations and adequate descriptions." (Id.) He had a slight problem in one activity – "[c]omprehending and/or following oral instructions" – and no problem in four other activities. (Id.) She did not observe the remaining three activities.

(Id.)  She noted that Plaintiff did not "get an opportunity to experience a Montessori classroom due to his anger management." (Id.)  In the domain of attending and completing tasks, Plaintiff had a very serious problem in one: "[w]orking without distracting self or others." (Id. at 40.)  He had either a slight problem or no problem in the remaining twelve activities.  (Id.)  She noted that Plaintiff became frustrated and aggressive when he had difficulty with a particular assignment.  (Id.)  In the domain of interacting and relating with others, Plaintiff had a very serious problem in two activities, "[e]xpressing anger appropriately" and "[r]especting/obeying adults in authority," a serious problem in one activity, "[s]eeking attention appropriately," an obvious problem in one activity, "[f]ollowing rules," and either a slight problem or no problem in the remaining nine activities.  (Id. at 41.)  The teacher noted that Plaintiff usually needed help but was not willing to listen to the person trying to help him.  (Id.)  She also cautioned that he had only been in her class for three days.  (Id.)  Plaintiff had no problem in the domain of moving about and manipulating objects.  (Id. at 42.)  He did have a very serious problem in three activities in the domain of caring for himself:  "[h]andling frustration appropriately," "[r]esponding appropriately to changes in own mood," and "[u]sing appropiate coping skills to meet daily demands of school environment." (Id. at 43.)  He had a slight problem or no problem in the remaining seven activities.  (Id.)

In January 2006, Plaintiff was evaluated by Martin, Rosso, Ph.D.  (Doc. 14-4 at 20-24.)  Ms. Wooten reported that Plaintiff had trouble at school getting along with his peers and teachers and accepting discipline.  (Id. at 21.)  Behavior and attention problems were his

only psychiatric concerns.  (Id.)  Plaintiff did not play well with his peers and would get into

fights with them.  (Id.)  He also had difficulty following directions.  (Id.)  Ms. Wooten felt

that some of Plaintiff's problems were caused by hin being behind at school.  (Id.)  Plaintiff

had recently been placed on medication, which was helping to calm him down.  (Id.)

As part of the evaluation, Plaintiff was given the Wechsler Intelligence Scale for

Children – Third Edition ("WISC-III").  (Id. at 21-23.)  His scores on that test indicated a full

scale intelligence quotient ("IQ") of 83, placing him in the low average range of intellectual

functioning.  (Id. at 22.)  Additionally, he was average in his ability "to solve everyday

problems using language," in his social language, in perceptual reasoning, and processing

speed.  (Id. at 23.)  He was below average in his abstract use of language and in his working

memory.  (Id.)  Based on his full scale IQ, he "would be expected to achieve academically

in the average range."  (Id.)  Dr. Rosso assessed Plaintiff as having ADHD, combined type,

oppositional defiant disorder, reading disorder by history, and a GAF of 50 due to "[s]erious

[s]ymptoms in [s]chool [f]unctioning."  (Id. at 24.)

Citing the records from Hopewell Clinic and Dr. Rosso's report, M. Lee Borrine,

Ph.D., completed a Childhood Disability Evaluation Form ("CDEF") in February 2006.  (Id.

at 25-31.)  Plaintiff's impairments were attention deficit and behavior disorder, oppositional

defiant disorder, learning disorder, and reading disorder.  (Id. at 25.)  These impairments

were severe, but did not meet or medically or functionally equal an impairment of listing-

level severity.  (Id.)  Specifically, the impairments resulted in a less than marked limitation

of Plaintiff's ability to acquire and use information, to attend and complete tasks, to interact

and relate with others, and to care for himself. (Id. at 27-28.) The rating in his ability to interact and relate with others was based on the report of his teacher that he had very serious problems with anger expression and respecting adults, the report of his mother that he had no friends his own age and had difficulties making friends (these problems had improved since Plaintiff was on medication), and the observations described in interview notes that Plaintiff meddled with a sibling until Ms. Wooten placed him in her chair. (Id. at 27.) The impairments resulted in no limitation in his ability to move about and manipulate objects or in his health and physical well being. (Id. at 28.)

Mr. Hartman, Plaintiff's teacher at Dunbar, also completed a Child Functioning Questionnaire for Plaintiff in April 2007 at his attorney's request. (Id. at 75-82.) In the domain of acquiring and using information, he rated Plaintiff's level of difficulty as extreme[10] in the activity of comprehending written instructions. (Id. at 76.) Plaintiff had a moderate level of difficulty in the activities of learning new material, understanding verbal instructions, demonstrating problem solving skills, remembering instructions, using appropriate vocabulary, following instructions, counting or spelling, and recognizing and using concepts. (Id.) He had no difficulties in the remaining four activities. (Id.) The teacher noted that Plaintiff's reading ability was at an early kindergarten level, which caused him difficulties when completing lessons. (Id.) In the domain of interacting and relating, Plaintiff had an extreme level of difficulty in four: "[g]etting along with other children"; "[g]etting along with authority figures;" [d]ue to unprovoked hostility or anger"; and "[d]ue to aggression."

---

[10]There were four levels of difficulty: none, moderate, marked, and extreme.

(Id. at 77.)  He had moderate difficulty in five activities, including "[s]haring/taking turns,"

"[r]especting authority/being obedient" and "[i]nteracting appropriately with adults," and no

difficulty in two.  (Id.)  The teacher noted that Plaintiff became "explosive" if he felt

"cornered" by adults."  (Id.)  "He attacks fellow students with only minor provocation."  (Id.)

In the domain of attending and completing tasks, Plaintiff had extreme difficulty in fourteen

of twenty-two activities.  (Id. at 78.)  He had moderate difficulties in six activities and no

difficulties in two.  (Id.)  In the domains of moving and manipulating objects and health and

physical well being, he had no difficulties.  (Id. at 79, 81.)  In the domain of caring for

himself, he had moderate difficulties in "[p]roper hygiene and personal care" and in "[b]eing

unable to enjoy or fully participate in group activities."  (Id. at 80.)

## The ALJ's Decision

After noting that there was no evidence that Plaintiff, then nine-years old, was

engaged in substantial gainful activity, the ALJ concluded that he had ADHD and

oppositional defiant disorder.  (Doc. 14-2 at 17.)  These impairments were severe.  (Id.)

They did not, however, result in any marked limitation and did not meet Listing 112.11 for

ADHD.  (Id. at 18.)  Nor was there any evidence to the contrary.  (Id.)

Because Plaintiff's impairments did not, singly or in combination, meet or medically

equal an impairment of Listing-level severity, the ALJ addressed the question of whether the

impairment(s) were the functional equivalent of a Listing-level impairment.  (Id.)  As to

Plaintiff's ability to attend and complete tasks, the ALJ noted that the medical records

showed some improvement with treatment.  (Id. at 20.)  One of his teachers rated Plaintiff

as having an extreme impairment in fourteen of the twenty-two activities; another rated him has having a very serious problem in one of thirteen activities. (Id.) Drs. Reid and Borrine rated him as having a less than marked impairment in the domain. (Id.) Absent any contrary opinions from a medically accepted source, the ALJ agreed. (Id.)

In the domain of interacting and relating with others, the ALJ found that Plaintiff had behavior issues. (Id.) He noted that Plaintiff was not in a behavior disorder classroom, nor had he been referred for consideration of such placement. (Id. at 20-21.) The ALJ further noted that the medical evidence showed that Plaintiff had been improving with medication. (Id. at 21.) He concluded that Plaintiff had a less than marked impairment in the domain. (Id.)

Plaintiff also had a less than marked impairment in the domain of caring for yourself. (Id.) One teacher had rated him as having no problem in sixteen of twenty activities in the domain; another rated him as having no problem or only a slight problem in all but three of ten activities. (Id.) Dr. Reid opined he had no impairment; Dr. Borrine that he had less than a marked impairment. (Id.) The ALJ agreed with Dr. Borrine. (Id.)

Plaintiff had no limitation in the domains of moving about and manipulating objects or in health and physical well being. (Id.)

In reaching the foregoing conclusions, the ALJ noted that Plaintiff had not been referred to special education for learning, attention, or behavior problems. (Id. at 22.) One teacher did not see Plaintiff has severely impaired as the other teacher. (Id.) He had not

followed through on his threat against the teacher.  (Id.)  There was minimal evidence of treatment, and no evidence of treatment after June 2006 was submitted.  (Id.)

Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id. at 23.)

## Legal Standards

Title 42 U.S.C. § 1382c(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence.  **Rucker v. Apfel**, 141 F.3d 1256, 1259 (8th Cir. 1998); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl v. Shalala**, 47 F.3d 935, 937 (8th Cir. 1995).  "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's decision.'" **England v. Astrue**, 490 F.3d 1017, 1019 (8th Cir. 2007) (quoting Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision.  **Id.**; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Tate v. Apfel**, 167

F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). <u>See</u> <u>also</u> **Reed v. Sullivan**, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (internal quotations omitted)).

Under the Act, as amended by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, the ALJ inquires into (1) whether the child is currently engaged in substantial gainful activity; (2) whether the child suffers severe impairments or a combination of severe impairments; and (3) whether the child's impairments meet or equal any listed impairments. **Garrett ex rel. Moore v. Barnhart**, 366 F.3d 643, 647 (8th Cir. 2004); **Bryant v. Apfel**, 141 F.3d 1249, 1251 (8th Cir. 1998). If the ALJ finds at step two of the evaluation that a child's impairments are severe, as in the instant case, then the question at step three is whether those severe impairments cause "marked and severe functional limitations" in one of six domains and whether they meet the duration requirement of at least one year. 20 C.F.R. § 416.924(d). "An impairment(s) causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings." <u>Id.</u> <u>See</u> <u>also</u> 20 C.F.R. § 416.924(a); 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B. "An impairment is functionally equivalent to a listing when the impairment results in an 'extreme' limitation in one domain of functioning or a 'marked' limitation in two domains of functioning." **England v. Astrue**, 490 F.3d 1017, 1020 (8th Cir. 2007) (citing 20 C.F.R. § 416.926a(a). The six domains are (1) acquiring and using information, (2) attending and completing tasks, (3)

interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

## Discussion

Plaintiff argues that the Commissioner's adverse decision is not supported by substantial evidence on the record as a whole.  The Commissioner disagrees.

The ALJ agreed with the opinions of Drs. Reid and Borrine that Plaintiff had less than a marked impairment in the domain of the ability to attend and complete tasks, explaining that, although one teacher had found extreme impairments in the majority of the listed activities and the other teacher had found a very serious problem in one of thirteen listed activities, Drs. Reid's and Borrine's opinions were the only ones before him by a medically accepted source.

The ALJ also found that Plaintiff had less than a marked impairment in the domain of interacting and relating with others, explaining that Plaintiff (a) was not in a classroom for behavior disorders and had not been referred for such placement, and (b) had improved with medication.

Further, the ALJ noted, and Dr. Reid stressed, that Plaintiff had not been referred to a special education program for learning, attention, or behavior problems.

"[I]naccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand."  **Draper v. Barnhart**, 425 F.3d 1127, 1130 (8th Cir. 2005).  For the reasons set forth below, the Court finds there are inaccuracies, incomplete analyses, and unresolved conflicts in the record that require remand.

The domain of attending and completing tasks requires a consideration of "how well [the child is] able to focus and maintain [his] attention, and how well [he] begin[s], carr[ies] through, and finish[es] [his] activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h). Attention "involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance." 20 C.F.R. § 416.926a(h)(1)(i). The first second-grade teacher had taught Plaintiff for only three days. She opined that he had a very serious problem in working without distractions. The second, second-grade teacher, who had apparently taught Plaintiff for one quarter, assessed Plaintiff as having extreme difficulty in the majority of the twenty-two listed activities for that domain.

Social Security Ruling 06-03p considers teachers and other educational personnel as "non-medical sources" who may have close contact with claimants and who may be "valuable sources of evidence for assessing impairment severity and functioning." Social Security Ruling 06-03p, 2006 WL 2329939, *3 (S.S.A. 2006). Such sources often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." Id. The Ruling further provides that:

> For opinions from sources such as teachers, counselors, and social workers . . . and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.

Id. at *5.  The opinions of Plaintiff's two teachers that he had difficulty with some activities in the attending and completing tasks domain are consistent with his mother's descriptions of his abilities.[11]  And, although the ALJ correctly noted that one teacher did not find Plaintiff's impairments to be as severe as the other teacher, the ALJ did not address the difference in the teachers's contacts with Plaintiff, the first teacher having taught him for three days at the beginning of the school year and the second teacher, the one who assessed the impairments to be more severe, having taught him for a quarter of the school year.  Moreover, these teachers had close contact with him, compared to Drs. Reid and Borrine, who had none.  Additionally, Dr. Reid and the ALJ incorrectly relied on the lack of placement of Plaintiff in a special education program.  Ms. Wooten tried to have Plaintiff assessed for an IEP; the school declined on the grounds that the school did not have enough information, not because such placement was not appropriate.[12]  Also, Plaintiff had repeated the second grade.  Cf. **England**, 490 F.3d at 1022 (finding that the ALJ had not erred in concluding that child who had not repeated any grades did not have a marked limitation in the attending and completing tasks domain).  The record indicates that he had not been in school for various reasons, including threatening a teacher and allegedly engaging in sodomy with another boy.  This later allegation arose after Plaintiff's dosage of Concerta had been

---

[11]The ALJ does not state in his decision whether he found those descriptions to be credible.  Instead, he found that a full consideration of those descriptions "in conjunction with the medical evidence" did not establish a disabling impairment.

[12]The letter reporting that there was no record of placement in a special education program is for a child other than Plaintiff.

increased, calling into question the ALJ's conclusion that Plaintiff was improving with treatment. The record further indicates that he could not return to school without certain information being received from Dr. Gonzalez. And, Dr. Gonzalez noted during her first interview with Plaintiff that he had difficulty sitting still. Cf. **Id.** (ALJ correctly noted examining consultant's report that claimant only had "'some difficulty' in staying on track during his interview").

When assessing Plaintiff's abilities in the domain of interacting and relating with others, the ALJ again improperly relied on Plaintiff not being referred for placement in a classroom for behavior disorders and having improved with medication. This domain requires a consideration of "how well [the child] initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [his] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i). As noted above, the school declined to develop an IEP for Plaintiff because it did not have sufficient information. Indeed, his school records include one report when he was in the second grade for three days in September 2005 and one report from the next year when he was again in the second grade for the third quarter in the winter of 2007. The second teacher described Plaintiff as becoming "explosive" if "cornered" and as attacking other children with minor provocation. There are references to him being voluntarily pulled by his mother and to him not being readmitted to school absent the receipt of certain information. Both the ALJ and Dr. Reid

stressed the lack of a special education placement when assessing Plaintiff's ability to function.  As noted above, this reliance is misplaced.

"[T]he ALJ must consider the whole record."  **Reeder v. Apfel**, 214 F.3d 984, 988 (8th Cir. 2000).  In this case, that requires consideration of evidence showing that Plaintiff had significant difficulties in the short, sporadic time he attended school and that his improvement on medication was questionable at best.

The ALJ also has the duty "'to develop the record fairly and fully, independent of the claimant's burden to press his case.'"  **Scott ex rel. Scott v. Astrue**, 529 F.3d 818, 824 (8th Cir. 2008) (quoting Snead v. Barnhart, 2360 F.3d 834, 838 (8th Cir. 2004)).  There are references in the record  to Plaintiff being diagnosed with lead poisoning in 2003 and being assessed by his pediatrician at an unknown date with a GAF of 38 to 40; however, only the Hopewell Clinic records are included.  There are references to Plaintiff and his brother not being readmitted to school without a diagnosis and report of treatment; however, there are no school records confirming or explaining this request.  The only school records for Plaintiff are of the second grade – three days in September 2005 and one quarter in 2007. There are no records, or testimony, indicating any school attendance for kindergarten or first grade.   And, although the ALJ and Dr. Reid both emphasized Plaintiff's apparent improvement on medication and lack of treatment after June 2006, the ALJ did not inquire of Ms. Wooten why Plaintiff was no longer being treated or probe Plaintiff's suspension from school at a time when he was prescribed an increased dosage of Concerta.  See **Reeder**, 214

F.3d at 988 (remanding to Commissioner case in which ALJ failed to "conduct a very probing inquiry" into factors crucial to a disability determination).

<u>Conclusion</u>

The ALJ improperly relied on the lack of special education placement and on Dr. Reid's opinion also relying on this lack when assessing Plaintiff's ability to function in three domains. The ALJ also incompletely analyzed Plaintiff's improvement with treatment, having failed to address the increased dosage, the indications of severe behavior problems on such dosage, and the lack of any records for treatment after the summer of 2006. For these reasons, the case should be remanded for development of the record on Plaintiff's school absences and medical treatment and for a reconsideration of the record as a whole. Accordingly,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be REVERSED and the case be REMANDED for further proceedings as outlined above.

The parties are advised that they have **up to and including December 29, 2008**, by which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. <u>See</u> **<u>Griffini v. Mitchell</u>**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of  December, 2008.